# In the United States Court of Federal Claims

No. 09-388 C
Filed Under Seal October 23, 2009
Reissued November 4, 2009[*]
TO BE PUBLISHED

_____

| | |
|---|---|
| AFGHAN AMERICAN ARMY SERVICES CORPORATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| NCL HOLDINGS, LLC, | ) ) |
| Defendant-Intervenor. | ) ) ) ) |

Post-Award Bid Protest; Cross-Motions for Judgment on the Administrative Record; Prejudice to Protestor Due to Errors in the Procurement Process;  Propriety of Injunctive Relief; Price Realism Analysis; Independent Government Estimate; Best-Value Analysis; Failure to Comply With Material Requirement of Solicitation; Evaluations of Offerors' Past Performance and Past Experience; Bid Preparation and Proposal Costs; Interests of National Defense and National Security

_____

Philip J. Davis, Wiley Rein LLP, Washington, D.C., for plaintiff.  Nicole P. Wishart, Jon W. Burd, and Julie A. Dunne, Wiley Rein, LLP, Washington, D.C., of counsel.

Vincent D. Phillips, Trial Attorney, Steven J. Gillingham, Assistant Director, Jeanne E. Davidson, Director, Tony West, Assistant Attorney General, United States Department of Justice,

_____

[*]  This Opinion and Order was originally filed under seal on October 23, 2009 pursuant to the protective order entered on June 18, 2009 (docket entry 10).  The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the protective order.  The parties filed a Joint Report Identifying Proposed Redactions on November 2, 2009 (docket entry 44), proposing certain redactions, which the Court has reviewed and concluded are appropriate.  Accordingly, the Court is reissuing its Opinion and Order dated October 23, 2009 with redactions indicated by three consecutive asterisks within brackets and with minor revisions to correct clerical errors.

Washington, D.C., for defendant.  Peter F. Pontzer, United States Army Litigation Center, Arlington, Virginia, of counsel.

Jonathan D. Shaffer, Smith Pachter McWhorter PLC, Vienna, Virginia, for intervenor.  Mary Pat Gregory, Smith Pachter McWhorter PLC, Vienna, Virginia, of counsel.

## OPINION AND ORDER

This case is a post-award bid protest arising out of a solicitation for trucking services to provide transportation of goods for the multi-national forces in Afghanistan and surrounding countries which constitute the Afghanistan Theater of Operations.  Plaintiff Afghan American Army Services Corporation ("AAA") contends that the award was fatally flawed due to (1) the agency's failure to conduct an adequate price realism analysis; (2) the agency's failure to conduct a sufficient best-value analysis; (3) the agency's award of a contract to an offeror who failed to meet material solicitation requirements; (4) the agency's failure to reasonably evaluate AAA's past experience; and (5) the agency's failure to reasonably evaluate AAA's past performance. For the reasons discussed below, plaintiff's Motion for Judgment on the Administrative Record is **GRANTED**.  Defendant's Motion for Judgment on the Administrative Record and the similar motion of the intervenor are **DENIED**.  Rule 52.1(c) of the Rules of the Court of Federal Claims ("RCFC").

## I.      Background[1]

The military operations in Afghanistan obviously require the movement of various vital war materials between military bases and troops in combat.  Defendant's Motion for Judgment Upon the Administrative Record at 2 (docket entry 32, Aug. 25, 2009) ("Def.'s Br."); *see also* Administrative Record ("AR") Tab 175 at 2373.  The Joint Contracting Command for Iraq and Afghanistan ("JCC-IA" or "agency") had previously obtained this transportation, which it called "Host Nation Trucking" services ("HNT"), through Blanket Purchase Agreements ("BPAs") with seven companies.  AR Tab 175 at 2373; AR Tab 241 at 3442.  By 2008, AAA had been successfully providing trucking services as a BPA holder since 2006.  Plaintiff's Memorandum in Support of Its Motion for Judgment on the Administrative Record at 2 (docket entry 30-2, July 28, 2009) ("Pl.'s Br.").  AAA therefore believed that it possessed the appropriate trucks, equipment, and personnel for this kind of work, and was aware of the required security costs, "topographical challenges and security risks" involved.  *Id*.

In 2008, the Army decided to switch its acquisition of HNT from the BPAs to an Indefinite Delivery/Indefinite Quantity ("IDIQ") contract with multiple awardees who would receive firm fixed-price task orders. AR Tab 175 at 2373; AR Tab 241 at 3442.  The JCC-IA

---

[1]   Unless otherwise noted, all facts are drawn from the corrected Administrative Record (docket entry 27, July 22, 2009).

therefore issued a Request for Proposals ("RFP") numbered W91B4N-08-R-0022.  AR Tab 1.
The contract was to be for a base period of one year, with a one-year option, AR Tab 5 at 99, and
the total contract price for each awardee was to be $30 million.  AR Tab 228 (Notice of Award).

The Statement of Work ("SOW") mandated that offerors were to be able to supply "all
resources including logistics support and management necessary to provide up to 100 trucks per
day (estimated) for the secure long haul distribution of reconstruction, security and life support
assets from Forward Operating Bases (FOB) and distribution sites located throughout the
Afghanistan Theater of Operations."[2]  AR Tab 1 at 57.  Furthermore, "[a]ll vehicles, associated
equipment and services provided shall be safely operable; shall meet the intended functions and
operations of like new conditions; and be in accordance with the contract, local laws, and
regulations."  AR Tab 1 at 57.  Contractors had to ensure 24-hour-a-day availability of personnel,
trucks and equipment, 365 days a year.  AR Tab 1 at 57-58, 62-63.  Vehicle operators had to be
trained, qualified and properly licensed.  AR Tab 1 at 57.

A major difference between the BPAs and the proposed IDIQ contract was that the new
contract would require the awardees to provide an "In-Transit Visibility" ("ITV") system that
would permit the location tracking of each truck at all times.  AR Tab 1 at 60-61.  A subsequent
amendment to the RFP required that the "ping rate"[3] for the ITV system be less than five minutes
for voice systems and less than fifteen minutes for tracking devices.  AR Tab 13 at 146. The RFP
required that "[f]or each convoy that exceeds four vehicles" (1) "there must be two vehicles
equipped with [a] panic button and two-way voice capability"; (2) "[a]ll other vehicles
(excluding security vehicles) must be equipped with [a] GPS tracking device"; (3) "the systems
with the panic button and two-way voice capability must have a ping rate of no less than five
minutes"; and (4) "the tracking devices must have a ping rate of no less than 15 minutes."  AR
Tab 13 at 146.

In another major change from the BPAs, the RFP required the offerors to provide
Convoy Escort Teams ("CETs") to include "as a minimum requirement one lead and one trail
vehicle and one vehicle for every set of five vehicles."  AR Tab 1 at 64-65 ("As an example, if
there is a 20 vehicle convoy, the contractor will provide a total of six armed security escort
vehicles, one lead, one tail and four additional security vehicles.").  The contractor could provide
extra security if it wished, according to its security plan.  *Id.*  A later amendment to the RFP

---

[2]  "Life support" included services such as laundry, meals, and lodging for personnel.  AR
Tab 1 at 63.

[3]  The term "ping rate" refers to the frequency of the "pings" to be sent between the
convoy's tracking mechanism and the contractor's home base.  The "ping" allowed the contractor
to track a shipment through a global positioning satellite ("GPS") by periodically sending a
signal to update the location of the ITV tracking device.  A "ping"  is "[a] short message that an
application sends from one system on a network to another . . . . A system receiving a ping will
typically respond by immediately retransmitting the incoming message back to the original
sender." A DICTIONARY OF COMPUTING 382 (Oxford Univ. Press 6th ed. 2008).

made "security approach" a separate evaluation factor.  AR Tab 8 at 127-28.

### A.    Evaluation Factors

Each proposal was to be evaluated in five categories: (1) technical capability; (2) past performance; (3) past experience; (4) price; and (5) security approach.  AR Tab 8 at 126.  All proposals would first be examined to determine if they were technically acceptable, and among those passing this first test, awards would be made on a "best value" basis.  *Id.*  In determining the "best value," the JCC-IA announced that price would be considered as approximately half of the award decision, with the non-price categories (past performance, past experience, and security approach) given equal weight in the remaining half.  *Id.*  Offerors were "cautioned that award may not necessarily be made to the lowest priced offer."  *Id.*

### 1.    Technical Capability

The JCC-IA proposed to evaluate technical capability in five sub-areas.[4]  AR Tab 1 at 52.  Each offeror's technical capability would first be rated as acceptable or unacceptable, based on the feasibility and completeness of the offeror's proposal as a means of measuring the offeror's "understanding of the requirement and its ability to successfully complete contract requirements."  AR Tab 1 at 52.  The JCC-IA would not further consider any offerors that did not achieve an "acceptable" rating.  AR Tab 8 at 126.

### 2.    Past Performance

Each offeror was asked to provide up to three references to demonstrate "the degree to which . . . [it] has in the past three years . . . satisfied its customers, and efficiently and effectively managed [its] contracts, on projects of similar scope and magnitude."  AR Tab 1 at 49.  The solicitation provided that each reference would be evaluated as relevant, somewhat relevant, or not relevant.  AR Tab 1 at 53.  Relevant experience "involved the magnitude of effort and complexities which are essentially what the solicitation requires."  *Id.*  Somewhat relevant experience "involved the magnitude of effort and complexities including some of what the solicitation requires."  *Id.*  "Not relevant" experience "did not involve any significant aspects of what the solicitation requires."  *Id.*[5]  The agency noted that "[a] higher degree of relevancy will

---

[4]    These categories were "(a) Provide all resources including life support, logistics support, security approach and management necessary to provide secure long haul distribution of reconstruction, security, and life support assets from Forward Operating Bases (FOBs) and distribution sites located throughout . . . Afghanistan . . . .; (b) Provide security for convoys . . . .; (c) Provide all trucks and equipment . . . ; (d) Recruit and vet a qualified work force . . . ; (e) Provide a qualified operational staff, . . . , to include mobilization of key personnel and badging for all employees."  AR Tab 1 at 52 (internal references omitted).

[5]    The evaluation forms used by the JCC-IA labeled the categories as "very relevant," "relevant," and "not relevant."  Def.'s Br. at 14; AR Tab 268 at 3822.  Plaintiff argues that this

carry a higher weight when determining past performance ratings." *Id.*

For those references deemed relevant or somewhat relevant, the agency then assessed the amount of risk associated with the offeror based on its past performance using the following scale:

| PAST PERFORMANCE RATING SYSTEM | | |
| --- | --- | --- |
| **ADJECTIVAL** | **COLOR** | **DESCRIPTION** |
| Excellent/ Very Low Risk | Blue | Essentially no doubt exists that the offeror will successfully perform the required effort based on their performance record. |
| Good/ Low Risk | Green | Little doubt exists based on the Offeror's performance record, that the Offeror can perform the proposed effort. |
| Adequate/ Moderate Risk | Yellow | Some doubt exists based on the Offeror's performance record, that the Offeror can perform the proposed effort. |
| Marginal/ High Risk | Orange | Significant doubt exists that the offeror will successfully perform the required effort based on their performance record. |
| Poor/ Very High Risk | Red | It is extremely doubtful that the offeror will successfully perform the required effort based on their performance record. |
| Unknown/ Unknown Risk | Gray | Little or no relevant performance record identifiable; equates to an unknown risk rating having no positive or negative evaluation significance. |

AR Tab 1 at 53.

3.      Past Experience

The past experience category would measure the "offeror's proven capability to perform." AR Tab 1 at 50.  The agency noted that HNT services in Afghanistan "pose[] unique challenges and risks for which offerors must be prepared.  An offeror who has experience in providing freight transportation services in the U.S., for example, may not be prepared for the logistical, security and bureaucratic challenges in Afghanistan."  *Id.*   Offerors were evaluated in three sub-areas: (1) Field of work—whether the offeror had sufficient years of experience, education, training, and licensing; (2) Location of work—whether the experience was in Afghanistan or another similarly hostile environment; and (3) Logistics—whether the offeror had a reliable network of employees who could operate in Afghanistan.  *Id.*  Past experience was ranked on the same adjectival scale as Past Performance.  AR Tab 1 at 54.

4.      Price

The RFP stated that the agency would "evaluate price proposals to determine whether the offered price reflects a sufficient understanding of the contract requirements and the risk inherent in the offeror's approach." AR Tab 1 at 55.  Proposals that had "an unreasonable (high or low)

---

minor difference in terminology was prejudicial.  Pl.'s Br. at 31.

price may be deemed to be unacceptable and may not receive further consideration." *Id.*  The "competitive procurement will establish the basis for price reasonableness" and the "price proposals will be evaluated by comparison of proposed prices received in response to this solicitation." *Id.*  Price was also to "be a factor" in "making the final best value determination for award." *Id.*

To calculate price, the offeror was required to fill in what the agency termed Contract Line Item Number ("CLIN") pricing tables for the base year and option year, with fixed prices for short- and long-haul missions using different types of trucks.  AR Tab 8.  The offerors then had to use these CLIN prices to complete a table with estimated quantities of each CLIN resource to determine a "Total Evaluated Price," which represented the offeror's price to perform certain hypothetical task orders under the HNT contract.  AR Tab 1 at 55.

The agency then developed an independent government estimate ("IGE") by looking at historical data from the existing BPAs.  AR Tab 179 at 2502; AR Tab 16 at 149-50.  The agency selected seven locations "varying in degree of risk" and determined the per-day cost of each location under existing BPA contracts.  AR Tab 223 at 3321.  The per-day costs were averaged over five BPA vendors, applied to the hypothetical task orders, and then added to create an IGE of $3,466,050.00 that was used to compare to the offerors' Total Evaluated Prices.  *Id.*  The agency noted that "[b]ecause the IGE is based on averages, it is reasonable to include firms above and below the IGE in the competitive range."  AR Tab 179 at 2502.  Because the BPAs did not require the contractor to provide security, however, the IGE, based only on BPA data, did not include any allowance for security costs, and no adjustment was made to the IGE to account for this mismatch.

5.    Security Approach

On September 8, 2008, the agency amended the RFP to include a fifth evaluation category, security approach, which was to be "an assessment of the offerors' security approach for each proposal under consideration for possible award."  AR Tab 8 at 127.   Each offeror was required to describe a plan for three types of missions: (1) Routine missions, or "missions the contractor deems not hostile"; (2) Heightened security missions, or "missions the contractor deems to be hostile"; and (3) High-Value/Sensitive Cargo security missions, or missions with assets the Government has deemed "sensitive or critical."  *Id.* at 128.

Each offeror's security approach was graded on the following scale:

| ADJECTIVAL | COLOR | DEFINITION |
|---|---|---|
| Outstanding | Blue | A security approach that satisfies all of the Government's requirements with extensive detail to indicate feasibility of the approach and shows a thorough understanding of the problems and offers numerous significant strengths, which are not offset by weaknesses, with an overall low degree of risk in meeting the Government's requirements. |
| Good | Green | A security approach that satisfies all of the Government's requirements with adequate detail to indicate feasibility of the approach and shows an understanding of the problems and offers some significant strengths or numerous minor strengths, which are not offset by weaknesses, with an overall low to moderate degree of risk in meeting the Government's requirements. |
| Acceptable | Yellow | A security approach that satisfies all of the Government's requirements with minimal detail to indicate feasibility of the approach and shows a minimal understanding of the problems, with an overall moderate to high degree of risk in meeting the Government's requirements. |
| Marginal | Orange | A security approach that satisfies all of the Government's requirements with minimum detail to indicate feasibility of approach and shows a minimal understanding of the problem with an overall high degree of risk in meeting the Government's requirement. |
| Unacceptable | Red | A security approach that contains a major error(s), omission(s) or deficiency(ies) that indicates a lack of understanding of the problems or an approach that cannot be expected to meet requirements or involves a very high risk; and none of these conditions can be corrected without a major rewrite or revision of the proposal. |

*Id.* at 127.

       B.    *Consideration of Proposals*

          1.    <u>Selection of Awardees</u>

       The JCC-IA received 35 timely proposals, 14 of which were deemed technically unacceptable and dropped from the evaluation process.  AR Tab 176 at 2436.   The remaining offers proceeded to grading on the other four factors.  AR Tab 223 at 3306.  Eleven offerors were

eventually included in the competitive range,[6] and, after discussions, the agency rated them as follows:

| Identifier | Offeror | Technical Rating | Past Performance Rating | Past Experience Rating | Security Approach | Price |
|---|---|---|---|---|---|---|
| BD | TSG | Acceptable | Adequate/Moderate Risk | Good/Low Risk | Outstanding | $2,441,246.10 |
| S | MG-EMA | Acceptable | Adequate/Moderate Risk | Good/Low Risk | Good | $3,411,640.45 |
| IGE | | | | | | $3,466,050.00 |
| Q | HEB | Acceptable | Adequate/Moderate Risk | Adequate/Moderate Risk | Acceptable | $3,978,647.50 |
| G | Anham | Acceptable | Good/Low Risk | Good/Low Risk | Good | $4,601,768.80 |
| J | TBI/FHI | Acceptable | Adequate/Moderate Risk | Good/Low Risk | Outstanding | $5,222,150.00 |
| W | NCL | Acceptable | Good/Low Risk | Good/Low Risk | Good | $5,862,384.60 |
| D | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] |
| Z | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] |
| O | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] |
| C | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] |
| B | AAA | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] |

*Id.* at 3310.

On March 3, 2009, the Source Selection Authority ("SSA") decided to make awards to the following six entities: Defendant-Intervenor NCL Holdings, LLC ("NCL"), The Sandi Group ("TSG"), Mesopotamia Group—Ettefaq-Meliat-hai-Afghan Joint Venture ("MG-EMA JV"),

---

[6] On November 14, 2008, the Source Selection Evaluation Board ("SSEB") issued findings on the technically acceptable proposals. AR Tab 176 at 2428-92. Initially, nine firms, including AAA, were included in the competitive range. AR Tab 184 at 2556. At some point after the competitive range selection, the agency recognized an error and reconvened the SSEB to include a tenth company in the competitive range. AR Tab 182 at 2514. In January 2009, a second round of discussions was held based on an allegation of unbalanced pricing, that is, that although the total price was acceptable, the price of one or more contract line items was significantly over- or under-stated. These discussions ultimately led to the inclusion of an eleventh firm in the competitive range. AR Tab 241 at 3442; *see* FAR § 15.404-1(g)(1).

HEB International Logistics ("HEB"), Anham LLC ("Anham"), and TBI Transportation—Four Horsemen International Joint Venture ("TBI-FHI JV").  AR Tab 223 at 3322.  The SSA compiled a Source Selection Document explaining the ratings given to these six firms in each evaluation category.  AR Tab 223 at 3301-22.  Of the six firms selected, the SSA determined that they had "Past Performance and Past Experience ratings . . . [showing] proven performance and experience with large scale logistical and transport efforts within hostile environments."  AR Tab 223 at 3321.  The six awardees were, in fact, the six lowest-priced technically acceptable offerors.  Of the five offerors not chosen, the SSA explained:

> [T]he offeror with the lowest price out of those five [* * *] approximately $1M or 16% higher than the offeror with the highest price, [NCL], out of the six offerors chosen for award.  Also [* * *] was approximately double the IGE.  Considering that the price factor was evaluated as approximately equal to the non-price factors, . . . [the six] are the best values to the Government.

AR Tab 223 at 3322.

### 2.   Debriefing

AAA requested a debriefing, at which the agency provided AAA with ten slides briefly describing why AAA was not selected.  AR Tab 229 at 3329-39.  The agency noted several weaknesses in AAA's proposal.  First, as to past performance, it stated that "[s]ome doubt exists based on the Offeror's performance record, that the Offeror can perform the proposed effort," stating as reasons that AAA was "[u]nable/unwilling to perform certain missions on the BPA" and that the "[o]fferor provided additional [Past Performance]-Not relevant."  AR Tab 229 at 3334 (emphasis omitted).

With respect to past experience, the agency concluded that AAA had weaknesses because its "[l]icensing/certifications [were] vague" and "[l]ife support network lack[ed] detail."  AR Tab 229 at 3335.  On the security approach factor, the agency found that AAA's proposal "lack[ed] detail" for routine security.  AR Tab 229 at 3336.  Finally, the agency observed that AAA's price was [* * *] higher than the highest-priced awardee.  AR Tab 229 at 3337.  For these reasons, the agency concluded, other offerors were selected as providing the best value.  AR Tab 229 at 3338.

### 3.   Specific Discussions and Ratings

Several of the issues plaintiff raises relate to allegedly improper evaluation of its proposal or improper evaluation of or discussions with another offeror, HEB.  Thus, a detailed recounting of the events relating to the evaluations of these two proposals is necessary.

(i)      Evaluation of AAA

*Technical Capability.*   Like all others included in the final eleven, AAA was rated technically acceptable, although evaluators noted weakness in AAA's life support plan.  AR Tab 141 at 1981, 1984; Tab 142 at 1990.

*Past Performance.*   For past performance, AAA was rated "Adequate /Moderate Risk." AAA provided three references, principally relying on its BPA contract.  AR Tab 60 at 896, 899, 902.  It did not, however, include a completed performance survey for its work under the BPA, which was the only contract the agency deemed relevant.  *Id.* at 899; Def.'s Br. at 16.  The RFP required the offeror to submit a point of contact for each reference who would complete a past performance questionnaire.  AR Tab 1 at 49 ("These references must be able and willing to provide information regarding the Offeror's past performance for the projects identified by the Offeror.  It is incumbent on the Offeror to ensure any non-government reference is willing to provide past performance information pertaining to the Offeror and/or any partnering firms, critical subcontractors, etc.").

AAA's contact for its BPA contract, [* * *], was a member of the SSEB rating the HNT contract proposals and declined to complete a survey.  Pl.'s Br. at 35; Def.'s Br. at 16.  Nonetheless, the agency graded AAA's BPA experience as relevant and rated AAA's performance as "Adequate/Moderate Risk." AR Tab 144 at 2004.  Indeed, [* * *] observed that his "experience with AAA has shown that they are professional and knowledgeable.  I haven't heard of any major issues with this company.  I do know that they are [* * *] on the current BPA. Their monthly invoices have them in the [* * *]."  He also noted they were an [* * *] under the BPA.  AR Tab 143 at 2002-03.

AAA's other two past performance references were considered "not relevant." AR Tab 176 at 2459.  These two jobs were: (1) a firewood contract involving the manufacture, distribution, and sale of  "Firewood to ANA Regional Command, Brigade Garrisons, and Winter Base Camps throughout Afghanistan Theater of Operations," AR Tab 60 at 902; and (2) logistical support to an Italian team, under which AAA provided and distributed various vehicles to an Italian task force in Afghanistan.  AR Tab 61 at 910.  The agency noted that the sale of firewood was not relevant to the HNT contract.  AR Tab 143 at 2001; AR Tab 144 at 2006.  As to the logistical support contract, the agency concluded that it was "for the distribution of vehicles, but short term & not truly relevant." AR Tab 143 at 2001; *see also id.* at 1997 (noting of references provided "only one was relevant").

*Past Experience.*  AAA received a past experience rating of "Adequate/Moderate Risk." AR Tab 176 at 2471.  Although AAA had provided some transportation services in Afghanistan, AAA "failed to discuss licensing/certifications or a network.  They also did not address life support." *Id.*  On January 12, 2009, the Contracting Officer ("CO") e-mailed AAA observing that the life support plan was vague, and that AAA had failed to discuss "licensing/certifications or a network." AR Tab 269 at 3835.  AAA then provided additional detail, AR Tabs 270 & 271 at 3835-62, but the agency did not amend its rating.  AR Tab 223 at 3310.

*Price.*  AAA's quoted estimate was [* * *], the highest of all eleven companies included in the competitive range.  *Id.*

*Security Approach*.  AAA received an "acceptable" rating for its security approach.  *Id.* AAA initially proposed that security would be random and not always provided for routine routes, and when the agency sought clarification, AAA submitted additional information that did not change the agency's opinion of AAA's plan.  AR Tab 146 at 2020-29; AR Tab 223 at 3308. AAA's rating, therefore, remained at acceptable.

(ii)      Security Approach Evaluation of HEB

AAA challenges the agency's evaluation of HEB in the security approach category.  HEB initially received a security approach rating of unacceptable.  AR Tab 176 at 2484; AR Tab 223 at 3319.  Not unlike AAA, in discussions, HEB had stated that it did not feel it was cost-effective to add security to routine missions.  AR Tab 223 at 319.  In discussions, the agency asked for additional information because "[t]he Government believes this increases the risk to the Government in the security of our cargo" and "[t]here should be some type of security on the routine missions."  AR Tab 197 at 2944.  Furthermore, the agency found HEB's heightened security plan to be "adequate; however please, clarify if you intend on having a tail and lead vehicle.  Your response stated you will not increase the level of security provided to high value/sensitive cargo.  The Government feels this cargo requires a higher level of security than a 4:10 ratio of security vehicles."  *Id.*  HEB responded that:

> During routine missions HEB will ensure that convoys leaving the major hubs of Bagram, Kandahar and Kabul are not followed.  HEB will employ "watchers" at these locations and other hubs during major redeployment operations to report to Watan Risk Management if the convoys/trucks are being followed or to report any other suspicious activities. . . .  During heightened security, at least one security vehicle will be placed at each end of the convoy. . . . During high value/priority asset missions the normal amount of security will be increased from 2 security vehicles per 10 trucks to 4 security vehicles per 10 trucks.  Each of the security vehicles during these moves will have at least one light machine gun and RPG-7/8.  The cost on high value/priority shipments will increase an additional $1500.00 USD per truck per mission day.

AR Tab 197 at 2944-45.

On February 28, 2009, the agency requested clarification because "there was ambiguity on HEBs answers."  AR Tab 226 at 3326.  That is, "HEB stated that they would employ 'watchers' at major hubs for routine security. . . .  HEB did not specifically state that they would or would not meet the minimum 1:5 ratio on routine missions; however, in their response for high-value missions, HEB stated that the 'normal amount of security will be increased from 2 security vehicles per 10 trucks to 4 security vehicles per 10 trucks.'  This led the Government to

-11-

believe that the normal security was the 1:5 or 2:10 security mentioned here." *Id.* HEB clarified that it had intended to provide the minimum security required. *Id.* The parties disagree as to whether the agency's communication with HEB was a "discussion" intended to get HEB to change its proposal to meet the minimum security requirements—as AAA would characterize it, Pl.'s Br. at 51—or a "clarification" of HEB's already adequate proposal—as the agency maintains. Def.'s Br. at 36.

In addition, there was some question whether HEB's proposal met the minimum ping rate for the ITV system. AR Tab 197 at 2951-52. The agency conducted discussions with HEB about its proposed ITV plan, and HEB replied: "Due to the slow speeds normally run on Afghan roads, HEB has chosen the '15 minute ping rate.' Anything less would be excessive with little to nothing to show for the incurred cost." *Id.* at 2951. HEB also stated that "[e]ach mission will be accompanied by security personnel with access to satellite communications for use in real time reporting and emergencies. This option combined with the [Global Distribution Management System] will provide the most cost effective solution to achieve ITV and emergency reporting capabilities." *Id.* The agency concluded that HEB's proposal and additional communications had clarified that it would, in fact, meet the ping rate requirements. Def.'s Br. at 33. The agency states that based upon this information it decided to upgrade HEB's security approach rating to Acceptable. *Id.*; AR Tab 223 at 3319.

C.   *Procedural History*

AAA filed its ten-count complaint for declaratory judgment on June 16, 2009 (docket entry 1).[7] On June 19, 2009, this Court granted NCL's unopposed motion to intervene (docket entry 12). Plaintiff raised five issues: (1) whether the agency conducted an adequate price realism analysis; (2) whether the agency conducted a sufficient best-value analysis; (3) whether the agency awarded a contract to an offeror who failed to meet material solicitation requirements and held improper discussions with that offeror; (4) whether the agency reasonably evaluated AAA's past experience; and (5) whether the agency reasonably evaluated AAA's past performance.

The JCC-IA began placing orders against the new HNT contracts on April 17, 2009 and the contracts remain operative. Def.'s Br. at 8; AR Tab 241 at 3443. Because of the urgent national security sensitivity of the contracts, AAA does not seek to enjoin current performance of

---

[7] A different unsuccessful offeror filed a protest of the HNT contract award at the Government Accountability Office ("GAO") on March 25, 2009. Def.'s Br. at 8; AR Tab 234 at 3377-3416. JCC-IA overrode the automatic stay based on an "urgent and compelling need for secure convoy services in Afghanistan to support troops in combat." Def.'s Br. at 8; AR Tab 250 at 3559. On May 18, 2009, JCC-IA moved to dismiss the GAO protest on the ground that one of the partners in the joint venture comprising the petitioner was ineligible because it had been suspended by reason of its indictment for bribery and conspiracy to bribe a public official in Afghanistan. Def.'s Br. at 8 n.1; AR Tab 252 at 3586; AR Tab 249. The GAO dismissed the pending protest due to the filing of this lawsuit. AR Tab 260.

the contract, but rather requests that the Government "recompete" the option period, scheduled to begin in March 2010.[8]  *See* Plaintiff's Reply in Support of its Motion for Judgment on the Administrative Record at 3 (docket entry 34, Sept. 11, 2009) ("Pl.'s Reply").

After the conclusion of briefing on the parties' cross-motions for judgment on the administrative record, the Court heard oral argument on September 18, 2009.  After the argument, the Court requested additional briefing regarding potential remedies (docket entry 36, Sept. 21, 2009).  The parties submitted simultaneous supplemental briefs on October 2, 2009 (docket entries 41 & 42).

## II.    Standard of Review

Under 28 U.S.C. § 1491(b)(1), the court reviews a post-award bid protest such as this one to determine whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004); *see also* 28 U.S.C. § 1491(b)(4) (incorporating standards of review from 5 U.S.C. § 706).  To prevail, the complainant must establish by a preponderance of the evidence that defendant's actions either lacked a reasonable basis or violated applicable statutes and regulations.  *Banknote Corp.*, 365 F.3d at 1351.  The protestor must show that the agency failed to provide a "coherent and reasonable explanation of its exercise of discretion" or there was a "clear and prejudicial violation of applicable statutes or regulations."  *Id.*  Where the court "finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."  *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).  There is a "zone of acceptable results in each particular case," and the agency's decision must "be the result of a process that considers the relevant factors and is within the bounds of reasoned decision making."  *Info. Scis. Corp. v. United States*, 80 Fed. Cl. 759, 773 (2008) (internal citations and quotations omitted).

The greater the degree of discretion vested in the contracting officer, the more difficult the protestor's burden becomes.  *DynCorp Int'l v. United States*, 76 Fed. Cl. 528, 537 (2007).

---

[8]  Although the reply brief states plaintiff seeks to "recompete the option period," in its opening brief, plaintiff asked for an "award to AAA or, in the alternative, . . . a re-evaluation in a manner that complies with the Solicitation and applicable legal requirements" along with an injunction prohibiting the exercise of any contract option prior to the completion of such a re-evaluation.  Plaintiff's Motion for Judgment on the Administrative Record at 1 (docket entry 30, July 28, 2009).  The Court interprets the reply's request to "recompete the option period" as asking that the Court order the agency to decline to exercise its one-year option period on the HNT contracts and instead hold a new competition.  A "re-evaluation," as sought in the opening brief, however, seems to contemplate a remand to the agency with instructions to conduct a new evaluation of any portion of the original evaluation found to be erroneous with instructions to make a new award decision that would be effective for the option period.

Negotiated procurements allow the contracting officer a "breadth of discretion," imposing a heavier burden of proof on the protestor, and "best-value" awards afford the contracting officer additional discretion. *Id.* Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." *Id.* The court affords even greater deference in reviewing a technical evaluation because they are "discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *Electro-Methods, Inc. v. United States*, 7 Cl. Ct. 755, 762 (1985) ("[W]here an agency's decisions are highly technical in nature . . . judicial restraint is appropriate and proper.").

The disappointed offeror bears the burden to demonstrate an error of sufficient magnitude to warrant relief. *Maint. Eng'rs v. United States*, 50 Fed. Cl. 399, 410 (2001). Even if the protestor demonstrates that an error in the procurement process occurred, it must also show that the error prejudiced it. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). To establish prejudice, the protestor must prove that "there was a substantial chance it would have received the contract award but for this error." *Alfa Laval Separation Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999). *De minimis* errors in the procurement process do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996).

In reviewing cross-motions for judgment on the administrative record, the court must determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Prot. v. United States*, 72 Fed. Cl. 126, 131 (2006). In a manner "akin to an expedited trial on the paper record," the court will make findings of fact where necessary. *CHE Consulting, Inc. v. United States*, 78 Fed. Cl. 380, 387 (2007).

## III.    Analysis

The Court concludes, as detailed below, that the solicitation did not mandate the type of realism analysis the plaintiff contends was necessary. The solicitation did require more analysis than the agency actually did, however, and despite the highly deferential standard of review, the Court finds that the agency failed to abide by the terms of the solicitation with respect to the realism analysis, did not adequately set forth a best-value tradeoff, and awarded a contract to an offeror whose proposal did not conform to at least one material term of the solicitation.

### A.    *The Agency Failed to Conduct a Sufficient Price Realism Analysis*

The Federal Acquisition Regulation ("FAR") sets up several different methods for contracting officers to analyze the prices set forth in proposals, including "reasonableness" and "realism." Under FAR § 15.404-1(c), called "cost analysis" (which the Court will refer to as "price reasonableness" analysis), contracting officers are required to analyze the offeror's costs to ensure they are "fair and reasonable," which can be established by adequate price competition. *Id.* § 15.404-1(b)(2)(i). Another form of price evaluation, "cost realism" (frequently referred to as "price realism"), is far more involved. *Id.* § 15.404-1(d)(1).

-14-

The reasonableness analysis described in FAR § 15.404-1(c) is appropriate when the offerors must provide cost or pricing data, and should "verify that the overall price offered is fair and reasonable." *Id.* § 15.404-1(a)(3). The contracting officer must apply "judgment to determine how well the proposed costs represent what the cost of the contract should be, assuming reasonable economy and efficiency." *Id.* § 15.404-1(c)(1). The proper techniques for engaging in a reasonableness analysis include evaluating cost elements, including the "necessity for and reasonableness of proposed costs." *Id.* § 15.404-1(c)(2)(i)(A). The contracting officer conducting a reasonableness analysis may compare the proposal costs with:

> (A) Actual costs previously incurred by the same offeror;

> (B) Previous cost estimates from the offeror or from other offerors for the same or similar items;

> (C) Other cost estimates received in response to the Government's request;

> (D) Independent Government cost estimates by technical personnel; and

> (E) Forecasts of planned expenditures.

*Id.* § 15.404-1(c)(2)(iii). Thus, a "reasonableness" assessment does not evaluate the proposal's "separate cost elements and proposed profit," but instead compares the offeror's proposed price with proposed prices of other offerors and the independent government estimate. *OMNIPLEX World Servs. Corp.*, B-291105, 2002 CPD ¶ 199, 2002 WL 31538212, at *8 (Comp. Gen. Nov. 6, 2002).

A price/cost realism analysis as defined by the FAR, on the other hand, requires "evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal." FAR § 15.404-1(d)(1). A realism analysis is required for cost-reimbursement contracts, and "may also be used on competitive fixed-price incentive contracts or, in exceptional cases, on other competitive fixed-price-type contracts when new requirements may not be fully understood by competing offerors, there are quality concerns, or past experience indicates that contractors proposed costs have resulted in quality or service shortfalls." FAR 15.404-1(d)(3); *see also SecureNet Co. Ltd. v. United States*, 72 Fed. Cl. 800, 813 (2006); *Joint Venture Penauille/BMAR & Assocs.*, B-311200, B-311200.2, 2008 CPD ¶ 118, 2008 WL 2686507, at *4 (Comp. Gen. May 12, 2008) ("Although not required, an agency may also provide for a price realism analysis in a solicitation for award of a fixed-price contract for the purpose of assessing an offeror's understanding of the requirements and the risk inherent in an offeror's proposal.").

When an agency chooses to conduct a price realism analysis for a fixed-price contract, the results "may be used in performance risk assessments and responsibility determinations.

However, proposals shall be evaluated using the criteria in the solicitation, and the offered prices shall not be adjusted as a result of the analysis." FAR § 15.404-1(d)(3). "While the purpose of price realism analysis is to ensure that an offeror understands the solicitation requirements and actually can perform those requirements . . . in the manner that it proposes, the purpose of price reasonableness analysis is to ensure that the offeror's price is not unreasonably high or unreasonably low." *Erinys Iraq Ltd. v. United States*, 78 Fed. Cl. 518, 531 (2007).

For an IDIQ contract contemplating fixed-price task orders, the "realism" of offerors' proposed prices would not ordinarily be considered, because the fixed-price task order puts the risk of underpriced offers on the contractor. *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 755 (2008) ("Where the award of a fixed-rate contract is contemplated, the realism of offerors' proposed labor rates is not ordinarily considered since a fixed-rate contract . . . places the risk and responsibility of contract price and resulting profit or loss on the contractor.") (citing *PharmChem, Inc.*, B-291725.3 et al., 2003 CPD ¶ 148, 2003 WL 21982424 (July 22, 2003)); *Labat-Anderson, Inc.*, B-287081 et al., 2001 CPD ¶ 79, 2001 WL 410356, at *7 (Comp. Gen. Apr. 16, 2001) (drawing distinction between "cost realism" and "price realism," and concluding only "price realism" applies to fixed-price contract). Where an agency is worried about possible poor performance, however, it may provide for a price realism analysis in the solicitation of fixed-price proposals. *See Hydraulics Int'l, Inc.*, B-284684, B-284684.2, 2000 CPD ¶ 149, 2000 WL 1371001, at *10-11 (Comp. Gen. May 24, 2000).

Thus, the FAR required a "reasonableness" analysis for the HNT solicitation, which could include the use of an IGE, but only mandated a "realism" analysis if the solicitation called for it. *Femme Comp*, 83 Fed. Cl. at 755. If a realism analysis were to be conducted, then the contracting officer would not adjust the proposed prices to a level it found to be realistic, but would instead use the results of the analysis to assess performance risk and contractor responsibility. FAR § 15.404-1(d)(3).

As noted above, the HNT solicitation stated that the agency would "evaluate price proposals to determine whether the offered price reflects a sufficient understanding of the contract requirements and the risk inherent in the offeror's approach." AR Tab 1 at 55. Proposals that had "an unreasonable (high or low) price may be deemed to be unacceptable and may not receive further consideration." *Id.* The "competitive procurement will establish the basis for price reasonableness" and the "price proposals will be evaluated by comparison of proposed prices received in response to this solicitation." *Id.*; Def.'s Br. at 5.

Plaintiff maintains that this language mandated that the agency perform a price realism analysis. Pl.'s Br. at 18-19. The defendant is unclear on this point, repeatedly using the term "price realism analysis" in quotes and seeming not to take a definite position on whether the solicitation itself required a price realism analysis, only referring to the agency's "choice" to conduct one. *See* Def.'s Br. at 38-39; *see id.* at 40 ("The JCC-IA chose to analyze price proposals for realism as well as reasonableness, and did so appropriately.").

At least one judge of this court has construed similar language to require a price realism

analysis. *Med. Matrix, LLP v. United States*, 2007 WL 5161789, at *9 (Fed. Cl. Dec. 12, 2007) ("Although the Solicitation does not, in so many words, require the VA to conduct a 'price realism' analysis, it does indicate that '[p]roposals that are . . . unrealistically high or low in cost will be deemed reflective of an inherent lack of technical competence or indicative of a failure to comprehend the proposed requirements and will be rejected.' Seemingly, the quoted language reflects a desire, on the part of the agency, to conduct a price realism analysis, designed 'to ensure that an offeror understands the solicitation requirements and actually can perform those requirements prescribed in the [Solicitation] in the manner that it proposes.'") (quoting from solicitation and from *Erinys Iraq.*, 78 Fed. Cl. at 531). But such a solicitation requires a price realism analysis "for the limited purpose of measuring offerors' understanding of the requirements or to assess the risk inherent in an offeror's proposal." *Cortez, Inc.*, B-292178, 2003 CPD ¶ 184, 2003 WL 22399267, at *2 (Comp. Gen. July 17, 2003).

Assuming that a price realism analysis was required, what did the agency have to do to satisfy that requirement? The FAR does not mandate any particular method of proceeding, and "the nature and extent of a price realism analysis, as well as an assessment of potential risk associated with a proposed price, are generally within the sound exercise of the agency's discretion." *Pemco Aeroplex, Inc.*, B-310372.3, 2008 CPD ¶ 126, 2008 WL 2684841, at *5 (Comp. Gen. June 13, 2008).

The plaintiff principally challenges the agency's price realism determination because it believes the IGE itself was flawed, and secondly because "there is no analysis of whether awardees' unrealistically low prices are consistent with the awardees' unique technical approaches or are instead a hallmark of risk attributable to their failure to understand the HNT requirements." Pl.'s Reply at 4.

Taking the second objection first, the Court is not convinced that an analysis of "unique technical approaches" was contemplated or required by the RFP. Even where the RFP includes the term "realism," it does not necessarily commit the agency to a full "cost realism analysis" as contemplated by the FAR. *Compare Cube Corp.,* B-277353, 97-2 CPD ¶ 92, 1997 WL 605362, at *3 (Comp. Gen. Oct. 2, 1997) ("Here, notwithstanding the RFP's use of the term 'cost' to identify the evaluation factor and the statement that a cost or cost realism analysis would be performed, this does not . . . commit the agency to perform a cost analysis in accordance with [the] Federal Acquisition Regulation (FAR) . . . .") *with Info. Scis. Corp.*, 73 Fed. Cl. at 101 (requiring more stringent realism analysis when RFP stated that "price evaluation will focus *heavily* on the *realism of the proposed prices* for the scope and nature of the solution/services proposed") (emphasis in original).

As noted above, the nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation. The agency's "discretion is even more pronounced when the Solicitation is silent regarding the methodology to be used in conducting a 'price realism analysis,' as is the case here." *Info. Scis. Corp.*, 73 Fed. Cl. at 102; *PharmChem, Inc.*, B-291725.3 et al., 2003 CPD ¶ 148, 2003 WL 21982424, at *6 (Comp. Gen. July 22, 2003) (price

realism analysis can be reasonably conducted by "evaluat[ing] each line item and the total price for each proposal and compar[ing] them with [the] independent estimate and with other offerors' prices"). When the agency provides for "a price realism analysis in a solicitation for such purposes as measuring an offeror's understanding of the solicitation's requirements and for assessing the risk inherent in an offeror's proposal," an appropriate analysis can be whether the price is "reasonable and realistic," and ways to accomplish the testing include "comparison of the prices received with each other; comparison of previously proposed prices for the same or similar items; comparison with the independent government estimate; and analysis of pricing information provided by the offeror." *Matter of Burns & Roe Servs. Corp.*, B-296355, 2005 CPD ¶ 150, 2005 WL 2037620, at *5 (Comp. Gen. July 27, 2005) (approving price realism analysis where "the agency evaluated the realism of an offeror's price proposal by comparing prices against one another and the independent government estimate, reviewing each offeror's cost proposal for compliance with the terms of the solicitation, for mathematical accuracy, and comparing pricing data with the technical proposal"). The agency compared the prices received with each other and with an IGE based on acquisition of previous similar items, and reviewed the proposals for compliance with the terms of the solicitation. That would, in these circumstances, ordinarily satisfy its requirement to perform a realism analysis.

The more serious objection to the realism analysis is that the IGE itself was fundamentally flawed. An agency's price-realism analysis lacks a rational basis if the contracting agency made "irrational assumptions or critical miscalculations." *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000). AAA vigorously protests the use of the IGE because it was based on historical data that did not include the security component which added significant costs to the HNT services. AAA contends that "it cannot reasonably be argued that the actual HNT costs will not be substantially greater than the historical BPA costs (which included no contractor-provided security or tracking)." Pl.'s Reply at 7. The Government argues that "[t]he RFP used competition to establish that the offers were reasonable, and the IGE confirmed that the offerors were within a range somewhat above what the JCC-IA had already been paying for these services." Def.'s Br. at 44 (citing AR Tab 221 at 3284). The Government represents that the IGE, based upon historical prices under the BPAs, was used "to get a baseline sense of whether offers were even feasible." Def.'s Br. at 43; Oral Arg. Tr. at 48-49.

Plaintiff admits that the IGE did possess some value, though the method of its calculation "diminished the usefulness of the tool as a basis for comparison to the likely IGE costs." Pl.'s Reply at 7. The Government's representation that the offers were "somewhat above" the IGE is only generally true—two of the awardees' proposed prices (including security) were actually lower than the IGE (which did not include security). *See supra* p.8. The plaintiff asserts that "[s]everal proposed prices should have appeared so low to the agency as to require it to further analyze whether the awardees understood the requirements or whether their respective technical approaches supported the inherent risk of those low prices." Pl.'s Reply at 8. Defendant responds by referring to a declaration the CO provided to the GAO which stated that the fact there were multiple awardees meant there was little risk to the Government from an award to an

-18-

offeror with a low price.[9]  *See* Def.'s Br. at 42.  That is, if an awardee was unable to perform at the offered price, the Government could turn to an alternate awardee for the same services.  *Id.*

Assuming that this is true, it creates more problems than it solves for the Government. The Government claims that it was not worried about the risk of poor performance due to the existence of multiple awardees, and thus the use of a very rough estimate for an IGE (which it knew was understated because it did not include all the categories of work contained in the solicitation) was sufficient for its purposes.  But this contradicts the very reason for including the "realism" analysis requirement in its solicitation—that language reflects a concern about a risk of poor or non-performance.  *Computer Sys. Int'l*, B-276955, B-276955.2, 97-2 CPD ¶ 49, 1997 WL 464009, at *2 (Comp. Gen. Aug. 13, 1997)  ("[S]ince the risk of poor performance when a contractor is forced to provide services at little or no profit is a legitimate concern in evaluating proposals, an agency in its discretion may, as it did here, provide for a price realism analysis in the solicitation of fixed-price proposals.").  The agency's solicitation stated that it would evaluate realism, and the SSEB maintained that, in accord with the RFP, it had "evaluated price proposals to determine whether the offered prices reflect a sufficient understanding of the contract requirements and the risk inherent in the offeror's approach."  AR Tab 176 at 2491.  Because the price realism analysis is conducted to avoid poor performance due to underbidding, it is irrational to now state that the price realism analysis was not done properly (that is, based on a flawed IGE) because the agency did not actually care about potentially poor performance.

The plaintiff makes other arguments regarding the lack of sufficient documentation regarding the source, rationale for, and calculation of the IGE, including the use of straight rather than weighted averages.  Pl.'s Br. at 26-27.  These arguments may have merit, though the Court finds it unnecessary to reach them here.  The agency failed to evaluate whether the offerors could perform at their proposed prices and justifies that decision by making an apples-to-oranges comparison of the proposed prices to an average rate it had paid for prior work—without adjusting for the fact that the average excluded an entire category of work the HNT offerors proposed to perform.  The agency then awarded contracts to two offerors whose total proposed price was even lower than the average the Government knew was already significantly and

---

[9]  Contracting Officer [* * *] declared that:
There is limited inherent risk based on an inordinately low price for this contract. We awarded six IDIQ contracts.  The first task orders were issued for $2M per contractor.  The initial $2M per task order is the average for future orders, each carrier will have approximately 4 mission days per month—this equates to about $500K per mission day.  Each mission day is composed of multiple smaller missions.  The risk to the Government is low considering that contractors can be corrected/counseled each week on poor performance.  We will know immediately if a contractor does not complete a mission.  We also have five alternate awardees available if problems continue.  The Government's risk is not as high as [the GAO protestor] argues.  The risk is manageable.
AR Tab 250 at 3561.

materially understated.  The agency did not meaningfully conduct the price realism analysis it committed itself to in the solicitation, and it could not simply choose to ignore that requirement. The procedures called for in the RFP are binding "regardless of [the agency's] view of the appropriateness of the standard." *Alfa Laval*, 175 F.3d at 1367 (*quoting Alfa Laval Separation, Inc. v. United States*, 40 Fed. Cl. 215, 230 (1998)).  Thus, the agency erred in failing to conduct a sufficient price realism analysis, because the analysis it did undertake was based upon "irrational assumptions or critical miscalculations."

> B.    The Agency Failed to Conduct a Sufficient Best-Value Analysis

This same mid-stream switch of criteria resulted in the agency's failure to conduct a sufficient best-value analysis.  Contracting agencies must treat offerors equally and evaluate proposals "based solely on the factors specified in the solicitation."  10 U.S.C. § 2305(b)(1).  An agency's final award decision must be "based on a comparative assessment of proposals against all source selection criteria in the solicitation."  FAR § 15.308.  A best-value determination grounded in reason must generally be afforded considerable discretion.  *Grumman Data Sys.*, 88 F.3d at 995-96.

A best-value determination is a "tradeoff process" that "is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror."  FAR § 15.101-1(a).  For example, in a best-value procurement, the agency may decide to select a lower-technically-rated proposal—even if the solicitation emphasizes the importance of technical merit—if it decides that the "higher price of a higher-technically-rated proposal is not justified."  *Blackwater Lodge & Training Ctr. v. United States*, 86 Fed. Cl. 488, 514 (2009).  The Court will not disturb a best-value award so long as the agency "documents its final award decision and includes the rationale for any business judgments and tradeoffs made."  *Id.*; *see also id.* at 515-16 ("The law does not require the SSA to conduct an identical analysis of [the successful offeror's] unique strengths . . . . [I]t only compels the SSA to determine whether [the protestor's] unique strengths warranted the premium represented by its higher-priced proposal.").

The SSA stated that he chose the awardees because they provided the "best value" to the Government and that he did not choose the non-awardees because they were "higher priced" than the awardees.  AR Tab 223 at 3302, 3322.  All other things being equal, it is not irrational to consider a lower price to be a better value than a higher price.  FAR § 15.101 ("[I]n acquisitions where the requirement is clearly definable and the risk of unsuccessful contract performance is minimal, cost or price may play a dominant role in source selection.  The less definitive the requirement, the more development work required, or the greater the performance risk, the more technical or past performance considerations may play a dominant role in source selection.").  The category ratings for the awardees were substantially similar—indeed, to the extent they would be dispositive of a best-value tradeoff, AAA would be disfavored as an offeror with three yellow ratings.  (HEB, however, an awardee, also had three yellow ratings.)

The problem here is that the Government justifies its "best-value" tradeoff

-20-

because—sometime after the solicitation, which required at least some realism analysis—it decided that it was willing to incur the risk of poor performance associated with very low bids and thus no meaningful realism analysis was necessary.  Because the Government determined that it would not (at least with respect to price realism) evaluate the possibility that an offeror would not be able to perform, there was no "best-value" tradeoff to make regarding capability versus price.  The lowest prices were the best values.  Thus, although the RFP stated that the other evaluation categories would be weighted approximately equally with price, five of the six awardees had at least one yellow rating (HEB had three), while four of the five disappointed offerors had all green ratings or better (though AAA had three yellow ratings).  While it is not facially irrational to conclude that the lowest price is the best value, the agency altered its decision-making criteria sometime during the procurement, and its failure to evaluate the proposals according to the terms of the RFP resulted in an insufficient best-value tradeoff analysis.

C.       *The Agency Awarded a Contract to HEB Despite its Failure to Meet a Material Solicitation Requirement*

AAA raises several arguments relating to the allegedly unequal treatment of awardee HEB.  With respect to two of those arguments, the Court finds no error, but concludes that the agency's failure to eliminate HEB for refusing to meet the "ping" requirement of the solicitation resulted in an award to an offeror that did not meet a material solicitation requirement.

FAR § 15.306(d) authorizes discussions between the Government and offerors once the competitive range is established, with the purpose of allowing the offeror to revise its proposal.  These revisions are intended to maximize the Government's ability to obtain the "best value" in a procurement.  Discussions must be "meaningful"—that is, they must include sufficient information on the perceived weaknesses of the offeror's proposal so the offeror has a reasonable opportunity to address the weaknesses.  *Advanced Data Concepts v. United States*, 43 Fed. Cl. 410, 422 (1999), *aff'd*, 216 F.3d 1054 (Fed. Cir. 2000).  If discussions are held with one offeror, they must be held with all, in order not to favor one offeror over another.  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1318 (Fed. Cir. 2003); *Data Gen. Corp.*, 78 F.3d at 1561; FAR § 1.102(b)(3).

A "clarification" is a "limited exchange[]" made in order "to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors." FAR § 15.306(a)(1), (2).  When an agency holds discussions, it must hold them with all offerors, but there is no such requirement for clarifications.  *DynCorp*, 76 Fed. Cl. at 540.  Questions and requests for clarifications that do not address critical deficiencies in a proposal are not meaningful discussions.  *Dynacs Eng'g Co. v. United States*, 48 Fed. Cl. 124, 131 (2000).

1.      The Agency Did Not Allow HEB to Charge Extra For Security

In response to a discussions inquiry from the Government relating to the number of security vehicles HEB intended to provide, HEB responded, in part, that "[t]he cost on high value/priority shipments will increase an additional $1500.00 USD per truck per mission day." AR Tab 197 at 2944-45.  AAA contends that this demonstrates that the Government permitted HEB to separately price security in violation of the solicitation's terms, while the Government responds that this was not additional pricing, but instead HEB's misunderstanding of the solicitation.  Namely, the RFP stated that if the Government required an additional cargo truck to be present in case of mechanical breakdown, the Government would pay for the truck.  AR Tab 5 at 96.[10]  The Government states that "because HEB read the evaluation notice as imposing a new requirement, it included the price of the additional truck."  Def.'s Br. at 32.  This would only make sense if HEB misread or misunderstood the solicitation's specific reference to mechanical breakdown and somehow thought the cargo truck provisions related to a need for an increased security presence.  The Government asserts that it resolved this issue by engaging in a clarification with HEB in which HEB "agreed to meet the minimum in their response to [the discussion request] and that he would clearly state this again."  Def.'s Br. at 33.  Because, in this context, "meet the minimum" appears to refer to repeated communications between the Government and HEB regarding whether HEB would supply the required minimum ratio of security vehicles to convoy trucks, AR Tab 227, the communication does not seem to resolve any confusion over whether HEB was permitted to charge for an additional truck for high-value shipments.

Whatever HEB thought its communication meant, however, the Government clearly informed HEB it would not pay additional costs.  AR Tab 197 at 2955 ("Also, please note that any price increases must be reflected in your overall prices in the Schedule B.  The rates are a fixed price rate and will not increase or decrease at any time during the period of performance. You will have to allocate any increases into the fixed price cost for each asset type.  Please review and revise your Schedule B if there is a change required.").  Thus, the Government did not allow HEB to separately price security and there is no error on this point.

_____

[10]  The provision reads as follows:
Trucks.  Contractor shall provide trucks capable of pulling two loaded 20-foot containers at once; these same trucks must be capable of transporting one loaded 40-foot trailer or a 5,000 -10,000 gallon fuel tank, and oversized cargo . . . .  Each truck will have a duly licensed and otherwise certified driver.  As directed by the Government, the Contractor shall provide an additional truck (for each convoy with ten or more trucks in their trucking system) with driver(s) to accompany convoys in case of breakdown of another truck during movement.  When directed the Government will pay for the additional truck.

-22-

2.      The Government Was Not Unreasonable In Interpreting HEB's
        Discussions Response to Provide a 1:5 Ratio of Security Vehicles for
        Routine Security

With respect to the ratio of security vehicles to trucks, the minimum required by the RFP was one security vehicle per five trucks, and that minimum was to be provided for both routine and heightened security, with additional security for high-value missions.  HEB and AAA both initially declined to provide full security for routine missions—HEB proposed "watchers," while AAA proffered random security for routine convoys.  HEB also proposed a single level of security for both heightened and high-value missions.

In discussions with HEB, the Government indicated a need for additional security for high-value cargo.  HEB replied that for high-value missions it would increase the "normal" amount of security from two security vehicles per ten trucks to four security vehicles per ten trucks.  AR Tab 197 at 2944-45.  The Government requested further clarification because "HEB did not specifically state that they would or would not meet the minimum 1:5 ratio on routine missions; however, in their response for high-value missions, HEB stated that the 'normal amount of security will be increased from 2 security vehicles per 10 trucks to 4 security vehicles per 10 trucks.'  This led the Government to believe that the normal security was the 1:5 or 2:10 security mentioned here."  Tab 226 at 3326.  Defendant contends that this last communication was a mere "clarification" of HEB's already sufficient proposal, while plaintiff asserts that HEB was allowed to change its proposal to meet minimum requirements.  The Court concludes that the Government reasonably interpreted HEB's initial discussion responses as an agreement to provide a 2:10 ratio for missions other than high value, which would include routine missions.  HEB's statements, so interpreted, would then satisfy the need for a 1:5 ratio on routine missions and meet the Government's requirements.  The Court sees no error here.

3.      The Agency Unreasonably Failed to Eliminate HEB's Proposal for Failure
        to Meet a Material Solicitation Requirement

Most troublingly, there was substantial confusion over whether HEB's proposal met the minimum ping rate requirements for the ITV system.  AR Tab 197 at 2951-52.  The agency conducted discussions with HEB about its proposed ITV plan, and HEB replied: "Due to the slow speeds normally run on Afghan roads, HEB has chosen the '15 minute ping rate.'  Anything less would be excessive with little to nothing to show for the incurred cost." AR Tab 197 at 2951.  That would be fine, if a "15 minute ping rate" were an option that could be chosen under the RFP.  But what the RFP required was, for convoys exceeding four vehicles, "two vehicles equipped with [a] panic button and two-way voice capability" and that these two vehicles "must have a ping rate of no less than five minutes."  AR Tab 13 at 146.  Other vehicles in the convoy could have a GPS tracking device and a ping rate of 15 minutes, but for those two specific security vehicles, the RFP did not permit a 15-minute option.

The Government cryptically responds that "[t]he responses that the JCC-IA received from the offeror led the SSA to determine that HEB's revised security approach satisfies all of the

Government's requirements."  Def.'s Br. at 33 (citing to AR Tab 223 at 3319).  But this reference in the record does not mention, consider or address the deficiency in HEB's proposed ping rate.

The Government turns to a declaration from the CO, in which she stated that, during a meeting with an HEB representative, she "explained that the language in HEB's proposal was confusing.  We asked whether or not HEB was going to provide the minimum security requirements or not," and the HEB representative "responded with an affirmative answer."  AR Tab 250 at 3560; Oral Arg. Tr. at 58.  There is no indication that either party was referring specifically to the ping rate in this communication as opposed to other confusing language, such as the security ratio.  Moreover, blanket statements that an offeror will "meet the minimum" were insufficient under the terms of the RFP.  AR Tab 1 at 48 ("Statements that the offeror understands, can or will comply with the SOW . . . ; statements paraphrasing the SOW or parts thereof . . . ; and phrases such as 'standard procedures will be employed' or 'well known techniques will be used,' etc., will be considered unacceptable."); *see also* AR Tab 8 at 125 ("General statements that the offeror understands the problem and can or will comply with the requirements of the RFP will be considered inadequate.").  HEB never specifically stated that it would provide a five-minute ping rate, and thus its proposal failed to meet a mandatory requirement of the solicitation.

The United States Court of Appeals for the Federal Circuit has stated that "[i]n negotiated procurements, a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations."  *E.W. Bliss Co.*, 77 F.3d at 448 (citations omitted); *see also ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 71 (2001) (stating that a materially noncompliant proposal cannot form the basis for award).  HEB's proposal did not even purport to meet a mandatory term of the solicitation, and as such the award to HEB violated "clearly applicable procurement statutes and regulations."  *Alfa Laval*, 175 F.3d at 1367-68 (finding that waiving a mandatory solicitation requirement for one offeror was a violation of  "clearly applicable procurement statutes and regulation"); *Blackwater Lodge*, 86 Fed. Cl. at 505 ("A solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the bid.").

> D.    *The Agency Failed to Provide a Reasoned Explanation For Its Past Experience*
> *Evaluation of AAA*

The Court sees no problem with the agency's actions for the majority of issues AAA raises regarding the past experience evaluations.  AAA argues that the agency insufficiently valued offerors' past experience in Afghanistan as opposed to other hostile countries in the region (e.g., Iraq), but this impinges upon an area of substantial agency discretion.  The Court will not look to the Central Intelligence Agency's World Factbook, Pl.'s Reply at 29 n.18, to make a determination regarding matters within the agency's area of expertise and on a matter securely within its discretion.  The Court reaches the same conclusion regarding AAA's criticisms of the past experience evaluations of other offerors on a fact-by-fact basis.

However, with respect to AAA's responses to discussion questions about its licensing and certifications, the Government's argument is unpersuasive. On January 12, 2009, the CO sent an email to AAA with a list of matters for discussion, including AAA's "fail[ure] to discuss licensing/certifications or a network." AR Tab 269 at 3834. AAA responded, although the responses were originally omitted from the Administrative Record and submitted by the Government's later correction (docket entry 25, July 21, 2009) (included in the Administrative Record at Tabs 270 & 271). In that response, AAA stated that "[a]ll personnel are properly licensed and experienced in their field of work, any documentation requested will be furnished upon request," AR Tab 271 at 3852, though it is unclear whether those documents were provided, or are those papers contained at Tab 270. The plaintiff argues that the original omission of these documents indicates the agency never considered the submitted information, because there is no agency evaluation of the licensing and certification discussion responses. The agency thereafter assigned AAA a weakness for "vague" licensing and certification information. Pl.'s Reply at 27-28. The Government argues that the absence of evidence in the record means that the agency must have considered the submitted information and found it insufficient. Oral Arg. Tr. at 55 ("The record doesn't explicitly state that the Joint Contracting Command said anything else about it. From that lack of anything explicit, it's difficult to infer that they didn't look at it."). That argument is simply incorrect. The absence of evidence does not support a finding that the agency's conclusion was reasoned. *See AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 370 (2009) ("Because the agency has provided no supporting documentation to explain the scores it assigned . . ., this Court cannot determine whether the agency[] . . . took into account the amplified information on past performance and had a rational basis. As such, the Court sustains this ground of protest."). Thus, the Court sustains the protest with respect to this aspect of the past experience evaluation.

> E.   *The Agency's Past Performance Evaluations Were Reasonable*

This Court defers to the agency's past performance ratings and will not substitute its judgment for that of the agency if its rating is reasonable. *See, e.g., E.W. Bliss Co.*, 77 F.3d at 449. The plaintiff asserts multiple challenges to the past performance evaluations of itself and others, but does not raise issues that merit the Court's intervention. *Banknote Corp.*, 56 Fed. Cl. at 384 ("An offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably.") (quotation and citation omitted).

The Court finds plaintiff's argument regarding the use of an adverb in the past performance evaluation forms unpersuasive. While the solicitation stated that past performance would be evaluated to determine whether it was "relevant," "somewhat relevant" or "not relevant," the evaluation forms labeled the categories as "very relevant," "relevant," and "not relevant." Pl.'s Br. at 32; AR Tab 1 at 53; Tab 268 at 3822. In each case, there is a high level, a medium level and a low level, with nearly identical wording. The use of a different adverb did not change the substance of how the levels were applied (that is, a medium level reference, whether "relevant" or "somewhat relevant," was to be assigned if the "present/past performance programs involved the magnitude of effort and complexities including some of what the

-25-

solicitation requires.").[11]  AR Tab 1 at 53.

While it is true that "[w]hen an agency departs from the RFP's evaluation scheme, it may constitute evidence of arbitrary and capricious decision-making," Pl.'s Reply at 25, the Court sees no such arbitrary decision-making here, rejects the notion that this minor linguistic difference was in any way prejudicial to the plaintiff, and concludes it did not result in some of its contracts being rated "not relevant" rather than "relevant" or "somewhat relevant."  *Cf. Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1379 (Fed. Cir. 2009).  The agency documented its reasons for deeming these contracts "not relevant."  The plaintiff disagrees with those reasons and the agency's determination, but that is no basis for the Court to second-guess the agency's exercise of its discretion.

The plaintiff also complains that the Government's brief indicates the "evaluators *required* offerors to submit *completed* past performance surveys."  Pl.'s Reply at 26.  That is, plaintiff accuses the Government of imposing an "unstated and unreasonable requirement to submit *completed* questionnaires" regarding past performance references.  *Id.*  The RFP indicates that the contractor was to submit a point of contact who was responsible for completing a past performance questionnaire for each reference.  The offeror had to ensure that the person it chose was "willing to provide past performance information."  AR Tab 1 at 49.  The plaintiff was thus on notice that the Government would be reviewing and considering the past performance questionnaires completed by those references.  (After all, submission of incomplete questionnaires would hardly assist the Government in making a procurement decision.)  The plaintiff's proposal was not rejected for the lack of completed performance evaluations, but the absence was noted, including in a pre-award email to the plaintiff.  AR Tab 269 at 3834.  There is nothing irrational about this process.

The plaintiff further faults the agency's method for assigning "adequate/moderate risk" ratings to offerors with either a single relevant prior contract or past performance under the BPA (that is, a prior relevant contract).  Pl.'s Reply at 27 ("This analysis is inconsistent with the RFP because it does not examine substantive past performance and makes no distinction between different levels of performance under the BPA.").  This also takes issue with the agency's reasoning in an area where it possesses substantial discretion.  *See Banknote Corp.*, 56 Fed. Cl. at 384.

Finally, AAA argues that it was not given an opportunity to respond to adverse past performance information, namely, that AAA was allegedly "[* * *] on the BPA."  Pl.'s Reply at 24.  The Government basically admits that it did not allow AAA to respond to this allegation, but contends that AAA received the same past performance rating as other offerors with one relevant

---

[11]  At oral argument, plaintiff's counsel stated that the discrepancy cost AAA the benefit of the "somewhat relevant" category, because "relevant" means 100% relevant.  Oral Arg. Tr. at 36.  That is only true where "relevant" is the top category.  In a scheme where "very relevant" exists, then that is the appropriate place for a 100% relevant contract, and merely "relevant" is something less than that.

contract, and was thus not assigned any "weakness" for the alleged refusal to perform missions. Def.'s Br. at 25-26; Oral Arg. Tr. at 54-55. The relevant FAR provision states that

> At a minimum, the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, . . . adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.

FAR § 15.306(d)(3). The FAR thus mandates that the contracting officer "indicate to, or discuss with" the offeror any "adverse past performance information to which the offeror has not yet had an opportunity to respond," and then encourages the contracting officer to discuss "other aspects" of the proposal that could potentially be explained to enhance the offeror's rating. If the fact that AAA was "[* * *] on the BPA" was "adverse past performance information," then the contracting officer was required to bring it up, but if it was merely an "other aspect" that could be explained to enhance AAA's rating, discussion was optional.

The Court interprets the Government's response as a statement that AAA's being "[* * *]" was insufficiently "adverse" to cause a downward change in AAA's past performance rating—AAA received the same rating as all offerors with one relevant contract. Thus, even if AAA believes this information is inaccurate, it did not prejudice AAA's position in the evaluation process. In order to prevail on this point, AAA must show a "clear and prejudicial violation" of the regulation. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (citation and quotation omitted). The Court sees one possible, though doubtful, violation and no prejudice regarding the evaluation of AAA's past performance, and thus concludes the protest should not be sustained insofar as it challenges the agency's evaluation of the offerors' past performance.

## IV.   Relief

The Court concludes that although significant errors in the procurement process occurred here, injunctive relief is not warranted. AAA will be awarded its bid preparation and proposal costs as the remedy for the flawed evaluation of its proposal.

Injunctive relief is an extraordinary remedy that will not be awarded unless the plaintiff meets a heavy burden. *Dynacs Eng'g*, 48 Fed. Cl. at 616. To determine the propriety of injunctive relief, the Court examines: (1) whether there was a reasonable likelihood that the protestor would have been awarded the contract in the absence of the identified errors; (2) whether the protestor will suffer irreparable harm if injunctive relief is not granted; (3) whether awarding injunctive relief is in the public interest; and (4) whether the harm to the protestor outweighs the harm to the Government and third parties. *Id.*; *Info. Scis.*, 80 Fed. Cl. at 796-97.

A.       *AAA Was Prejudiced by the Errors in the Procurement Process*

Despite the existence of errors in a procurement, the plaintiff is not entitled to relief unless it can show prejudice, that is, "a reasonable likelihood that the protestor would have been awarded the contract but for the error." *Data Gen. Corp.*, 78 F.3d at 1562.  The Government contends that even if there were errors in the procurement, AAA cannot show there was a "substantial chance it would have received the contract award but for these errors."  Def.'s Br. at 45 (quoting *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005)).

 While it is true that "AAA was the most expensive offeror in a best-value procurement where price was weighed as approximately equal to past performance, past experience, and security approach," Def.'s Br. at 45, the agency failed to conduct a price realism analysis it chose to impose upon itself that would have determined if the promised services could have actually been provided at those lower prices.  It is also true that "AAA received lower [technical] ratings than four other offerors also not awarded contracts." *Id.*  But once again, a proper price realism analysis, best-value tradeoff, and past experience evaluation could have changed that result.  AAA was "within the zone of active consideration" and that suffices to demonstrate prejudice. *Alfa Laval*, 175 F.3d at 1367 (quoting *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983)).  A protester suffers irreparable injury when it has been deprived the opportunity to compete fairly for a contract. *See Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 110 (2004).

Moreover, the award to HEB, an offeror who failed to meet a material term of the solicitation, is error as a matter of law that, if corrected, would necessarily have put the identification of awardees in play.  HEB received identical adjectival ratings to AAA in the five evaluation categories.  The only difference between HEB's award and AAA's lack of award was a substantial difference in price.  If the agency had examined the realism of prices—that is, the extent to which HEB's low price (among others) risked a failure to perform (or a failure to perform well)—it might have decided to pay more for AAA's services.  AAA does not need to establish that if the errors were corrected it absolutely would have received a contract; its burden is to show that there is a "substantial chance" that if the evaluation had been properly conducted AAA would have obtained an award. *Bannum*, 404 F.3d at 1358.

This is a protest regarding a multiple-awardee IDIQ contract.  It differs from a case involving an ordinary, single-awardee contract, where any offeror who "finish[es] lower than second after evaluation" is not an "interested party" capable of bringing a protest. *Galen Med. Assocs., Inc. v. United States*, 56 Fed. Cl. 104, 108 (2003).  In a multiple-award contract, prejudice analysis must take into account the impact of the error on all the awards, including whether the correction of an error "might not only improve the protester's evaluation, but diminish that of a current awardee, or even eliminate that awardee from further consideration altogether." *Serco Inc., v. United States*, 81 Fed. Cl. 463, 501 (2008)  ("With all of these varied dimensions, and since it [is] beyond peradventure here that the slightest shifting of a single adjectival rating could have significant impact not only on the ranking of a given protester, but also on who they might be compared with in a tradeoff analysis, the court is left with the firm

conviction that the combined impact of the errors encountered here clearly prejudiced . . . the [protestor].").  AAA was within the competitive range, and has established that there was a "reasonable likelihood" it would have received a contract but for the agency's errors.  AAA was therefore prejudiced by the errors in the procurement process.

> B.     *Injunctive Relief is Not Appropriate*

While AAA possessed a "substantial chance" or "reasonable likelihood" of receiving an award in the absence of error, that result was by no means certain.  It is entirely possible that a proper re-evaluation of the original proposals would result in at least some awards to different awardees, but would nonetheless still exclude AAA.  The harm to AAA from the procurement errors is therefore somewhat less than in cases like *Dubinsky v. United States*, 44 Fed. Cl. 509 (1999), where the protestor was the next-lowest-priced offeror, and *Dynacs Engineering v. United States*, 48 Fed. Cl. 614 (2001), where the protestor submitted one of only two proposals in the competitive range.  While AAA has suffered some harm, the scope of that harm is uncertain.

Even assuming that AAA would receive a contract award, the extent of the harm it would suffer in the absence of an injunction is less than one might originally assume.  Both the loss of the opportunity to perform the contract and the lost profits are attenuated by the fact that this contract is now being performed, with the one-year base period to expire on February 28, 2010.  AAA concedes, due to the defense and national security implications of the contract, that it would not seek to perform the base year, but would attempt to receive an award for the 12-month "option year."  *See* 28 U.S.C. § 1491(b)(3).  If the contract continues on its present course, even if the options are exercised, the contract will necessarily conclude by February 2011.  Thus, the harm to AAA if the Court declines to issue an injunction is the loss of the opportunity to be considered for a contract that there is a good chance it would not receive anyway.  If it did, performance would be for, at the most, a twelve-month option period, after which the HNT services are set to be re-solicited.

Turning to the interests of the Government and the public, the Government contends that either a re-solicitation or a re-evaluation would be disruptive to the duties of the personnel on the ground seeking to supply troops with necessities in a war zone.  The HNT services are a vital part of the war effort.  See Decl. of [* * *], Ex. A to Def.'s Supp. Br. at ¶ 3 (docket entry 42, Oct. 2, 2009) ("Host Nation Trucks have a direct impact on the success of the U.S. mission in Afghanistan.  There are no other known shipping options available over land to move the significant amount of cargo required by our warfighters.  Disruption of these contracts will cut off supplies from reaching Forward Operating Bases."); Decl. of [* * *], Ex. B to Def.'s Supp. Br. at ¶ 2 ("It is imperative to our troops in combat that these services not be interrupted or delayed.").

The Government states that a new solicitation would take fourteen months.  Oral Arg. Tr. at 64; Decl. of [* * *], Ex. B to Def.'s Supp. Br. at ¶ 8 ("We would need approximately fourteen months to recompete this acquisition.").  Assuming the Government is correct, and the Court were to order a new solicitation in October 2009, the new solicitation would be completed by

December 2010, two months before the option period is set to conclude, thus allowing nearly the full contract term to be performed by the existing awardees. Moreover, given the impending expiration of the contract term (even including the option year), the relevant contracting personnel are now working on the 2011 solicitation of HNT services. The Government represents that it would unduly strain its limited personnel to manage the existing HNT contract, prepare for the 2011 solicitation, and at the same time conduct corrective action or a re-solicitation of the current contract. Decl. of [* * *], Ex. B to Def.'s Supp. Br. at ¶ 14 ("As a practical matter, if we are working on the corrective action, we have less time to work on managing the current contract and preparing the next acquisition. . . . New personnel will be responsible for continuing the procurement mid-stream which will slow down the overall process with a learning curve by the incoming contracting personnel.").

A re-evaluation is likewise problematic. The solicitation in this case was issued on August 5, 2008, and the proposals were submitted on October 4, 2008, rendering them now a year out of date. A re-evaluation of these possibly stale proposals that conducted a meaningful price realism analysis, for example, would address at least the proposals in the competitive range, not just those submitted by the awardees and AAA. But none of the other non-awardee offerors were parties to this proceeding, and their continued interest in this contract is not presently known. The Government represents that to properly re-evaluate proposals it "would need to identify new technical evaluators, educate the new evaluators to the acquisition, create a new [IGE] to evaluate price, conduct another round of discussions, allow offerors to submit revised proposals, reevaluate the new proposals, and make a new award determination." Decl. of [* * *], Ex. B to Def.'s Supp. Br. at ¶ 11; *see also* Pl.'s Supp. Br. at 8 ("At a minimum, a remand here should include discussions with offerors in the competitive range, the receipt of discussion responses and revised proposals (if any) and the re-evaluation of the most current proposal information. The agency should also amend the Solicitation to reflect its updated requirements."). Even if the re-evaluation advanced more quickly than the new solicitation, the base year would in all likelihood be over by the time the re-evaluation was complete. Decl. of [* * *], Ex. B to Def.'s Supp. Br. at ¶ 13 ("Even if the remand for corrective action proceeded more quickly than a new competition, the reevaluation and transition could not be completed by March 2010 . . . ."). Therefore some portion of the option year would nonetheless be performed by the existing awardees, and the strain on the Government's personnel is similar.

Generally the public interest is served by ensuring fair and open competition in the procurement process. *Cincom Sys. v. United States*, 37 Fed. Cl. 266, 269 (1997). But this Court is statutorily required to "give due regard to the interests of national defense and national security and the need for expeditious resolution" in resolving a bid protest. 28 U.S.C. § 1491(b)(3); *Geo-Seis Helicopters v. United States*, 77 Fed. Cl. 633, 650 (2007) (noting that the Government's allegations involving national security "must be evaluated with the same analytical rigor as other allegations of potential harm to the parties," but tailoring injunctive relief to avoid impinging upon national security). In assessing the harm to the public interest resulting from injunctive relief, the Court will not "blindly accede to [national security] claims." *Geo-Seis*, 77 Fed. Cl. at 650 (quoting *Harris Corp. v. United States*, 628 F. Supp. 813, 822 n.13 (D.D.C. 1986)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 129 S. Ct. 365, 381 (2008) (finding no basis for enjoining

naval sonar training where injunction was "credibly alleged to pose a serious threat to national security"). The Court will balance national security concerns with the "overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations." *Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005). The mere fact that national security concerns are implicated does not create a "law-free zone" where ordinarily applicable legal principles must necessarily yield to the demands of homeland security.

The Court therefore weighs the following factors: (1) a "reasonable likelihood," though not a certainty, that AAA would have received a contract in the absence of agency error; (2) even if injunctive relief were granted, the existing awardees would perform the entire base year; (3) even if injunctive relief were granted, the necessity for, at minimum, significant amendments to the solicitation and/or the IGE, revised proposals, and renewed discussions, during which some or all of the option year would be performed by the existing awardees; (4) the current preparation for resolicitation of the HNT services at the end of the option year—a resolicitation that AAA is free to participate in; and (5) harm to the public interest resulting from disrupting the duties of personnel who are ensuring the transportation of necessary goods to warfighters and preparing for the next contract solicitation. The plaintiff flatly denies the Government's concerns regarding time and personnel issues, but the Court does not find that denial persuasive. Given these factors, the Court concludes that the harm to AAA does not outweigh the harm to the Government and the public interest, and finds that injunctive relief is inappropriate in this case. *Dynacs Eng'g*, 48 Fed. Cl. at 616; *Info. Scis.*, 80 Fed. Cl. at 797.

C. *An Award of Bid Preparation and Proposal Costs Is Appropriate*

Although injunctive relief is not warranted, the plaintiff is not without remedy. Under 28 U.S.C. § 1491(b)(2), the Court "may award any relief that the Court considers proper" including "bid preparation and proposal costs." Such an award "helps to ensure that the government complies with procurement regulations," *Dynacs*, 48 Fed. Cl. at 620, even when the performance of the contract itself cannot be enjoined. Because the Government has committed multiple errors in this solicitation that prejudiced plaintiff, the Court concludes that an award of bid preparation and proposal costs is appropriate. *See also* Decl. of [* * *], Ex. B to Def.'s Supp. Br. at ¶ 16 (stating that award of bid preparation and proposal costs "would not hinder the JCC-I/A in its mission to deliver reconstruction materials, security equipment, and life support items throughout the Afghanistan Combined/Joint Area of Operations").

## CONCLUSION

For the foregoing reasons, the motions of the intervenor, NCL Holdings, LLC, and the Government for judgment on the administrative record are **DENIED** and the motion of AAA is **GRANTED**.[12]  AAA's request for injunctive relief is **DENIED**, but an award of bid preparation and proposal costs is **GRANTED.**

The Court therefore **ORDERS** that the plaintiff submit a detailed verified statement of its bid preparation and proposal costs to the defendant on or before **November 20, 2009**.  The parties shall thereafter confer regarding a stipulation of appropriate bid preparation and proposal costs.  Upon reaching agreement, the parties shall file a stipulation with the Court for the entry of judgment for plaintiff in that amount.   In the event that the parties are unable to agree, they shall, on or before **December 18, 2009**, file a status report with the Court so stating and setting forth a proposed schedule of further proceedings to resolve the matters still in dispute.

**IT IS SO ORDERED.**

s/ George W. Miller
GEORGE W. MILLER
Judge

---

[12]     Some information contained herein has previously been designated by the parties as proprietary and/or competition-sensitive subject to the protective order entered in this action on June 18, 2009 (docket entry 10).  This Opinion and Order shall therefore initially be **filed under seal.**  The parties shall review the opinion to determine whether, in their view, any information should be redacted in accordance with the terms of the protective order prior to publication.  The parties shall file, within 10 days of the filing of this Opinion and Order, a joint report identifying the information, if any, they contend should be redacted, together with an explanation of the bases for their proposed redactions.